IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ADAM R. TATE, | ) | Case No. 1:24-cv-00866 |
| | ) | |
| Plaintiff, | ) | JUDGE CHARLES ESQUE FLEMING |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Adam R. Tate ("Tate"), seeks judicial review of the final decision of the

Commissioner of Social Security denying his application for Disability Insurance Benefits

("DIB") under Title II of the Social Security Act. Tate raises one issue on review of the

Administrative Law Judge's ("ALJ") decision, arguing that the ALJ's RFC determination is

unsupported by substantial evidence and is the product of legal error because the ALJ

erroneously found Tate capable of performing past work as a bagger and an order picker. This

matter is before me pursuant to 42 U.S.C. 405(g), 1383(c)(3) and Local Rule 72.2(b). Because

the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision

supported by substantial evidence, I recommend that the Commissioner's final decision denying

Tate's application for DIB be affirmed.

## II.      Procedural History

Having previously been found not disabled by an ALJ on May 14, 2021 (Tr. 70-87), Tate

filed an application for DIB on November 2, 2021 alleging his disability began May 16, 2021.

(Tr. 291-93). He alleged disability due to learning disabilities, seizures, and shaky hands

1

syndrome. (Tr. 316). The claims were denied initially and on reconsideration. (Tr. 120, 141). He

then requested a hearing before an ALJ. (Tr. 171). Tate, with representation, and a vocational

expert ("VE") testified before the ALJ on December 20, 2022. (Tr. 41-69).

On November 17, 2022, the ALJ issued a written decision finding Tate not disabled. (Tr.

20-40). The Appeals Council denied his request for review on March 25, 2024, thereby rendering

the ALJ's decision the final decision of the Commissioner. (Tr. 1-7). Tate timely instituted this

action on May 14, 2024. (ECF Doc. 1).

## III.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Tate was 47 years old on the date his application was filed. (Tr. 312). He required special

education services while he was in school but was able to earn his high school diploma. (Tr.

317). He has past relevant work as a bagger, an order picker, and loader clerk. (Tr. 62).

### B.      Relevant Educational and Medical Evidence

Records show that on March 10, 2020, Tate presented to his cardiologist for his six

month follow up appointment with complaints of lightheadedness and dizzy spells. (Tr. 538). His

past medical history was significant for syncopal episodes thought to be neurocardiogenic in

nature. (*Id.*). An implantable loop recorder from August 2017 had previously demonstrated an

episode of non-sustained ventricular tachycardia at a rate of 214 beats per minute. (*Id.*). At his

appointment, Tate displayed no signs of ischemic heart disease or congestive heart failure. (*Id.*).

On March 20, 2020, Tate was brought to the emergency department following a potential

seizure episode. (Tr. 742). A bystander, who had performed CPR on Tate, reported that Tate was

having generalized tonic-clonic activity for two unclear spans of time. (Tr. 745-746). Tate was

aroused after his arrival in a confused state. (Tr. 746). He was loaded a dose of Keppra and

diagnosed with generalized tonic-clonic seizure and atrial fibrillation by neurologist Tea

Shergelashvili, M.D. (Tr. 754). Tate underwent a brain MRI on April 17, 2020, which showed ".

. . [s]cattered foci of subtle T2 prolongation mainly the subcortical white matter could represent

minimal chronic microvascular white matter ischemic changes in the appropriate clinical

setting." (Tr. 573). An EEG performed on May 19, 2020, was within the range of normal

variation. (Tr. 622-23). A sleep-deprived EEG performed on June 24, 2020, revealed no clear-cut

epileptiform activity. (Tr. 621).

On August 17, 2020, Tate presented to a neurology clinic reporting shaking and twitching

of his arms while he slept and headaches since he switched his dosage of Keppra. (Tr. 720). He

also had a worsening tremor of his right hand. (*Id.*). He underwent a five-day video-EEG

recording that demonstrated no abnormalities, and which provided assurance that his seizures

were under good control. (Tr. 719). His diagnosis included depression, unspecified type;

hypertension; GERD; and history of gastric bypass. (*Id.*). There is also notation of a previous

diagnosis of epilepsy with a history of syncope, as well as learning disorders, tremors, and sleep

apnea. (Tr. 384).

On September 10, 2020, Tate returned to his cardiologist for follow-up. (Tr. 519). The

cardiologist again noted no signs or symptoms suggestive of ischemic heart disease and/or

congestive heart failure, and also no worsening of symptoms of dyspnea and/or exercise

tolerance. (*Id.*). Tate was assessed with hypertension; neurocardiogenic syncope; obstructive

sleep apnea, left bundle-branch block; and non-sustained ventricular tachycardia. (Tr. 523).

At a September 17, 2020 visit to his primary care doctor, exam notes indicate that his

depression was showing improvement with his medications. (Tr. 487). On December 7, 2020,

Tate reported he had been short-tempered and had experienced mood swings he found

3

"bothersome." (Tr. 586). He also reported that his tremor was interfering with his activities of daily living. (*Id.*). He reported on January 20, 2021. that the Keppra was causing him to be moody, so his medication was switched. (Tr. 476). Following the change in his anti-seizure medication, Tate told his physician on March 4, 2021, that he was feeling "groggy," that he was taking more frequent naps, and that he was having intermittent headaches. (Tr. 582).

At a July 29, 2021 appointment with his neurologist, Tate complained of headaches occurring every other day with an intensity ranging from 4 to7/10. (Tr. 577). He described the headaches as sharp and pressure-like, causing light sensitivity, nausea and dizziness, and added that the headaches were worse in hot and humid conditions. (*Id.*). He also described experiencing "drifty, daydreaming, episodes of blanking out." (*Id.*). These episodes were occurring about three times weekly for the last three months. (*Id.*). Examination notes from this visit indicated his essential tremor was "stable." (Tr. 580).

Tate was seen on August 2, 2021, for bilateral sensorineural hearing loss ("SNHL") and was evaluated for hearing aids. (Tr. 395). An otoscopy showed bilateral mild to moderate SNHL and indicated he would have difficulty hearing in most communication situations. (Tr. 401). He was deemed a candidate for aural amplification and was fitted for new hearing aids on September 22, 2021. (Tr. 405).

Tate complained of feeling down and irritable on August 9, 2021, and expressed that he felt his medications were no longer effective. (Tr. 462). His prescription was adjusted, and although he felt his new medications were somewhat helpful, he still felt depressed and wanted to increase his dosage. (Tr. 456).

On September 13, 2021, Tate's neurologist referred him for video-EEG monitoring due to staring spells that he reported were occurring one to two times weekly. (Tr. 551). He reported

the staring spells were brought on by watching television, but not by playing video games, which he often did all night. (*Id.*). He also added that he had low energy and motivation, and that he felt his Keppra had effectively treated his seizures, but he still felt depressed and anxious. (Tr. 665). The video-EEG monitoring was conducted for a period of 98 hours and 40 minutes, and was considered normal, with no indications of epileptiform discharges, paroxysmal features, focal features, or significant interhemispheric asymmetries. (Tr. 683).

Tate returned to his neurologist on November 20, 2021, and described headaches occurring three times weekly, as well as tremors that were affecting his activities including his hobby of assembling Legos. (Tr. 656). He admitted that he forgot to take his medication fairly regularly, including three times in the last two weeks. (*Id.*). He had begun counseling to try to address his mental health and had considered switching his medication to Depakote and Lamotrigine which could treat his seizures, mood disorder, and headaches simultaneously. (Tr. 661). His counselor's notes indicate he continued seeing her throughout 2022, attempting to work through issues of depression and anxiety, and symptoms including low motivation, moodiness, irritability, and poor sleep habits. (Tr. 799-842). He did see some improvement with medication. (Tr. 820).

At a February 24, 2022, appointment with his neurologist, Tate expressed that he was no longer having headaches because his medication had been adjusted, and he also felt his mood had improved slightly. (Tr. 778). His tremors however were slightly worse. (*Id.*). He had not had any seizures in almost two years, and he denied having staring spells. (*Id.*). He did admit that he was forgetting to take his medications about three times weekly. (*Id.*). Tate also attended a follow-up exam with his cardiologist on March 10, 2022, where he reported no change of symptoms. (Tr. 789).

5

### C. Medical Opinion Evidence

#### i. State Agency Reviewers

On February 23, 2022, state agency reviewing physician S. Putcha, M.D., determined that Tate was capable of performing work at all exertional levels but must avoid concentrated exposure to hazards such as machinery or heights. (Tr. 110-12). That same day, state agency reviewing psychologist L. Haus, Psy.D., opined that Tate had mild limitations in interacting with others, and moderate limitations in understanding, remembering, and applying information; concentration, persistence, and maintaining pace; and adapting and managing oneself. (Tr. 108). Dr. Haus further found that Tate was moderately limited in his ability to remember locations and work-like procedures; his ability to understand, remember, and carry out detailed instructions; his ability to maintain attention and concentration for extended periods; his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; his ability to travel in unfamiliar places or use public transportation; and his ability to set realistic goals or make plans independently of others. (Tr. 112-15).

At the reconsideration level on May 26, 2022, state agency reviewing physician S. Padmaraju, M.D., confirmed the opinion of Dr. Putcha. (Tr. 129). Similarly, that same day, state agency reviewing psychologist S. Bhutwala, Ph.D., confirmed the opinion of Dr. Haus. (Tr. 130).

#### ii. Consultative Examination Reports

On February 15, 2022, Tate attended a consultative examination with Jeanne Shapiro, Ph.D., alleging he was unable to work due to his fear of driving. (Tr. 765). He reported that he was married and that he was residing with his wife and in-laws. (*Id.*). He had a high school diploma, although he received special education beginning in ninth grade, and he had an

associate degree in arts and humanities. (*Id.*).  He was also certified in HVAC. (*Id.*). He had

started on-line counseling in October 2021 and was being treated for his depression and his fear

of driving. (*Id.*). He was having difficulty falling asleep and had an increased appetite that had

led to a 40-pound weight gain over the prior six months. (Tr. 766). He described himself as often

sad, unmotivated, and lethargic. (*Id.*). He complained of slight short-term memory deficits. (*Id.*).

Dr. Shapiro felt that Tate appeared to be functioning in the impaired range of intelligence (Tr.

767) and diagnosed him with adjustment disorder with depressed mood and intellectual

disability, provisional. (Tr. 768).

Dr. Shapiro opined that Tate did not appear to have any limitations in understanding,

remembering, and applying simple instructions and directions but would have moderate

limitations with more complex instructions and directions. (*Id.*). Dr. Shapiro felt Tate had no

limitations using reason and judgment to make work related decisions; interacting adequately

with supervisors, co-workers, and the public; or in sustaining concentration and performing a

task at a consistent pace. (*Id.*). Tate had moderate limitations sustaining an ordinary routine and

regular attendance at work, and mild limitations regulating emotions, controlling behavior, and

maintaining well-being. (*Id.*). There were no limitations in maintaining personal hygiene and

appropriate attire or in being aware of normal hazards and taking appropriate precautions. (*Id.*).

Dr. Shapiro opined that Tate had difficulties caused by psychiatric and cognitive problems, but

his fear of driving did not warrant a formal diagnosis. (*Id.*). His psychiatric problems did not

appear to be significant enough to interfere with his ability to function on a daily basis. (*Id.*).

That same day, Tate attended a consultative examination with Rita Figueroa, M.D.,

complaining of seizures, chronic headaches triggered by fluorescent light, essential tremors,

hypertension, and depression. (Tr. 771). Following a full examination, Dr. Figueroa diagnosed

seizures, chronic headaches, essential tremors, hypertension, history of depression, and morbid obesity. (Tr. 774). Dr. Figueroa opined that Tate should avoid ladders and unprotected heights due to the history of seizures, and determined he would have mild to moderate limitation for activities of fine motor skills due to a history of essential tremors. (*Id.*).

### D. Administrative Hearing Evidence

On November 17, 2022, Tate testified before the ALJ that he is married, and that he and his wife live with her parents. (Tr. 47-48). He has a driver's license, but he does not drive and depends on his father-in-law for transportation. (Tr. 48-49). He has a fear of driving that developed after his last seizure that he believes occurred in 2017. (Tr. 54). His doctor had told him not to drive until he figured how he would react to his medications. (*Id.*). He has an associate degree and had vocational training for heating and cooling. (Tr. 49).

Tate testified that he does not experience symptoms relating to his seizures, but he does suffer from side effects of his medications. (Tr. 55). The side effects include irritability, mood swings, and chronic headaches. (*Id.*). He also feels his tremors are getting worse, making it difficult to hold anything. (*Id.*). He shakes all the time, like aftershocks of an earthquake. (*Id.*). The tremors are mostly restricted to his hands, and they tend to get worse as the day goes on. (*Id.*). While he is able to grab a gallon of milk, unscrew a bottle top, or write a letter, he is unable to do his hobby of building models. (Tr. 56). He also has side effects from the medication he takes to treat his syncope. (Tr. 57-58). He had been experiencing headaches as a side effect of his anti-seizure medication but has not had any headaches since he changes his medication the prior year. (Tr. 58-59). He wears hearing aids because without them he is about "50 percent deaf." (Tr. 59).

Tate further testified that he attends weekly sessions at CHE Behavioral to treat his mental health. (Tr. 59-60). When he is in a depressive state, he complains about everything and is "super grumpy." (Tr. 60). He is "not the happiest guy to be around." (*Id.*).

Following Tate's testimony, a VE identified as Ms. Rosenblatt testified. (Tr. 61). The VE identified three prior jobs Tate had performed, the first being bagger, Dictionary of Occupational Titles ("DOT") #920.687-014, with an SVP of 2, performed at a medium exertional level. (Tr. 62). The second past job was order picker, DOT #922.687-058, SVP 2, generally performed at a medium exertional level but actually performed at a heavy exertional level. (*Id.*). Th third job was loader clerk, DOT #929.687-258, SVP 2, performed at a heavy exertional level. (*Id.*).

For her first hypothetical, the ALJ asked the VE to consider an individual who could perform work at all exertional levels but could not drive, climb ladders, ropes or scaffolds, work at unprotected heights or in close proximity to dangerous machinery. The individual could perform simple tasks as a consistent goal-oriented pace, and could frequently handle, finger and feel. (Tr. 62-63). The VE opined that such an individual could perform Tate's past relevant work as a bagger or as an order picker. (Tr. 63). For her second hypothetical, the ALJ asked the VE to consider all of the same circumstances of the first hypothetical, except that this individual would be limited to light work. (*Id.*). The VE opined that this individual would be unable to perform Tate's past work, but would be able to perform work as a marker, DOT #209.587-034, SVP 2, light exertion with 136,000 jobs in the national economy; as a housekeeper 623.587-014, SVP 2, light exertion with 177,000 jobs in the national economy; and as a cashier II, DOT #211.462-010, SVP 2, light exertion with 465,000 jobs in the national economy. (Tr. 63-64).

For her third hypothetical, the ALJ had the VE consider all of the same circumstances of the first hypothetical, except that this individual was also limited to frequent handling, fingering,

and feeling objects the size of a quarter or larger but could not work with items smaller than the size of a quarter. (Tr. 64). The VE opined that this individual could perform Tate's past relevant work as an order picker. (*Id.*). If, for a fourth hypothetical, the individual from the third hypothetical were further limited to the light exertional level, the VE felt that the individual could perform the marker and housekeeper jobs referenced earlier but would be unable to perform the cashier position. (Tr. 64-65). For a fifth hypothetical, the ALJ asked the VE to consider the same circumstances of the first hypothetical but add the restrictions that individual could frequently handle or feel, but only occasionally finger. (Tr. 65). The VE opined that this individual was incapable of performing Tate's past work, but could work as an usher, DOT #344.677-014, SVP 2, light exertion with 1,300 jobs in the national economy; sandwich-board carrier, DOT #299.687-014, SVP 1, light exertion with 900 jobs in the national economy; and school bus monitor, DOT #372.667-042, SVP 2, light exertion with 10,000 jobs in the national economy. (Tr. 65-66).

The VE opined that the jobs of order picker, bagger, marker, and housekeeper could all be performed if the individual could engage in occasional interaction with supervisors, co-workers and the public, while the cashier job could not. (Tr. 66). The VE further opined that an employer would tolerate ten percent time off-task in an eight-hour workday. Anything beyond that was work preclusive. (Tr. 66-67).

On questioning from Tate's representative, the VE testified that a limitation to occasional handling, fingering and feeling would eliminate all jobs discussed in her testimony other than school bus monitor. (Tr. 67). The VE also testified that if an individual were only to regulate their emotions or control their behavior on a frequent basis, that would eventually lead to dismissal from employment. (*Id.*). At the conclusion of the VE's testimony, the ALJ asked

10

whether her testimony had been consistent with the DOT and/or the SCO. (*Id.)* The VE confirmed her testimony had been consistent, but where the questioning touched on topics not covered in the DOT, those answers were based on the VE's professional experience and education. (Tr. 68)

## IV.     The ALJ's Decision

In her decision dated March 10, 2023, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2024.

2.    The claimant has not engaged in substantial gainful activity since May 16, 2021, the alleged onset date (20 CFR 404.1571 *et seq*.)

3.    The claimant has the following severe impairments: epilepsy, essential tremor, neurocardiogenic syncope, cardiac arrhythmia, obstructive sleep apnea, depressive disorder, and a learning disorder. (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant cannot drive, cannot climb ladders, ropes or scaffolds, or work at unprotected heights or close proximity to dangerous machinery. He can perform simple tasks at a consistent, goal-oriented pace. He can frequently handle, finger and feel.

6.    The claimant is capable of performing past relevant work as an order picker and a bagger. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 404.1565).

7.    The claimant has not been under a disability, as defined in the Social Security Act, since May 16, 2021, the date of this decision. (20 CFR 404.1520(f)).

(Tr. 14-40).

11

V.      **Law and Analysis**

A.      **Standard for Disability**

Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v) ; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

B.  **Standard of Review**

This Court reviews the Commissioner's final decision to determine if it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position,

the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

13

**VI.**       **Discussion**

Tate brings one issue for this Court's review: Whether "the ALJ's determination is unsupported by substantial evidence and is the product of legal error because the ALJ erred in finding Plaintiff capable of performing past work as a bagger and order picker." (ECF Doc. 8, p. 4). Tate argues that the job tasks described by the DOT for the positions of bagger and order picker directly conflict with the ALJ's RFC. (*Id.* at 5). Therefore, the ALJ's determination is not supported by substantial evidence because the ALJ erroneously relied on the VE's testimony and did not address this conflict. (*Id.*).

With regard to the bagger position, Tate contends that the job requires "tend[ing] to packing machines, climbing, and considerable use of arms and legs for physically handling materials."[1] He notes that the DOT lists as the second item in order of importance under "Performing General Physical Activities" the requirement of "[p]erforming physical activities that require moving one's whole body, such as in climbing, lifting, balancing, walking, stooping . . ."[2] Tate further argues that the "Work Context" section of the job description lists "frequent climbing of ladders scaffolds and poles, etc.", while several other tasks under this occupation require more than "frequent handling, fingering and feeling."[3] Tate cites similar language from the DOT with regard to the order picker position, noting that the position requires the performance of physical activities that require moving one's whole body, such as climbing,

---

[1] In his Brief on the Merits Tate cites https://occupationalinfo.org/onet/98902a.html for these job requirements. (ECF Doc. 8, p. 8).
[2] In his Brief on the Merits, Tate cites https://occupationalinfo.org/onet/98902a.html for these job requirements. (ECF Doc. 8, p. 8).
[3] In his Brief on the Merits Tate cites https://occupationalinfo.org/onet/98902a.html for these job requirements. (ECF Doc. 8, p. 8).

lifting, balancing, walking and stooping, and also require considerable use of the arms and legs, such as in the physical handling of materials. [4]

Tate asserts that where there is an apparent unresolved conflict between VE testimony and the DOT it is incumbent on the adjudicator to elicit a reasonable explanation for the conflict before relying on the VE's testimony. (ECF Doc. 8, p. 9). At the hearing, the VE testified that the DOT does not provide detail regarding the extent of frequent fingering, handling, or feeling, time off task or ability to regulate emotions, and her opinion was based upon her education, professional training, and experience. (Tr. 67-68). Despite that statement, Tate contends, the conflict was not addressed, and therefore the VE testimony cannot be relied upon. (ECF Doc. 8, p. 9).

The Commissioner responds that because Tate failed to raise the issue at the administrative level below, he has waived his challenge to the vocational evidence. (ECF Doc. 10, pp. 5-6). Alternatively, the Commissioner argues that there are no conflicts between the RFC and the DOT's descriptions of the demands of the past relevant work. (*Id.*, at 6). The Commissioner contends that the job description for order picker in the DOT requires frequent handling and fingering but no feeling and does not specify when indicating that climbing is a necessary component whether that involves climbing ladders, ropes, or scaffolds, as opposed to ramps and stairs. (*Id.,* at 7). The occupation of bagger does not require climbing or feeling and requires only frequent handling and fingering. (*Id.*). The Commissioner thus argues there is no conflict between the RFC and the demands of Tate's past relevant work as described in the DOT. (*Id.*).

---

[4] In his Brief on the Merits Tate cites https://occupationalinfo.org/onet/98902a.html for these job requirements. (ECF Doc. 8, p. 8).

The Commissioner further argues that the potential conflicts Tate raises relies on descriptions of his past relevant work as provided in a separate source of information, that being O*NET. (*Id.*). Social Security Ruling 00-4p mandates that "an ALJ has an affirmative duty to inquire as to whether a vocational expert's evidence conflicts *with the information provided in the DOT* and to resolve any 'apparent conflicts.'" (*Id.* citing *Staymate v. Comm'r of Soc. Sec.,* 681 F. App'x 462, 468 (6th Cir. 2017) (citation omitted, emphasis added). The Commissioner contends that O*NET data, by comparison to the DOT, is not necessarily reliable. (ECF Doc 10, p. 8, citing *O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 317 (6th Cir. 2020)). Thus, assuming Tate has not waived his challenge to the vocational evidence in this case, the demands of his past relevant work, as described in the DOT, do not exceed his RFC. (*Id.*).

As a threshold matter, "the claimant bears the burden of proving . . . the fact that [he] is precluded from performing [his] past relevant work . . . ." *Turner v. Comm'r of Soc. Sec.*, No. 2: 19-cv-900, 2019 WL 5781608 at *4 (S.D. Ohio Nov. 5, 2019) citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). To meet this burden, a claimant must show that he or she cannot perform his or her past relevant work as "actually performed" and as "generally required by employers throughout the national economy." (*Id.*). The governing regulations permit but do not require an ALJ to use the services of vocational expert to determine whether a claimant can return to her past relevant work. *Wright-Hines v. Comm'r of Soc. Sec.,* 597 F.3d 392, 395 (6th Cir. 2010); 20 C.F.R. § 404.1560(b)(2).

Where a VE proffers evidence at an administrative hearing in the form of expert testimony "the Social Security Administration imposes an affirmative duty on ALJ's to ask if the evidence they have provided 'conflicts with the information provided in the DOT." *Turner* at *5; *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009), quoting SSR 00-4p. If an

unresolved conflict is identified an ALJ is required to "elicit a reasonable explanation for the conflict before relying on the [VE's testimony as] evidence to support a determination or decision about whether the claimant is disabled." SSR-00-4p. However, where an ALJ inquires whether the VE's testimony is consistent with the DOT and is given an affirmative response, "the ALJ has met [his or] her obligation under SSR 00-4p, and there is no error in relying on the positions the VE offered." *Kyle v. Comm'r of Soc. Sec.,* 609 F.3d 847, 858 (6th Cir. 2010). Rather an obligation to investigate the accuracy of the VE's testimony "falls to the plaintiff's counsel who had the opportunity to cross examine the VE and bring out any conflicts with the DOT." *Beinlich v. Comm'r of Soc. Sec.*, 345 F.App'x 163, 168 (6th Cir. 2009). Further, when a VE testifies that the DOT does not address a particular matter in which case he relies on his experience for support, courts recognize this does not constitute a conflict with the DOT requiring further examination but is merely an example of the VE supplementing the DOT. *Greco v. Comm'r of Soc. Sec.* No.1: 23-cv-803, 2024 WL 3586352 (W.D. Mich. July 15, 2024); *Forrest v. Comm'r of Soc. Sec.,* 591 F. App'x. 359, 364 (6th Cir., Nov. 17, 2014) (no further examination of the vocational expert required where the vocational expert's testimony "supplemented, rather than conflicted with, DOT job descriptions").

The Sixth Circuit, along with other courts across the country, have generally recognized that a claimant's failure to object to testimony offered by a vocational expert, at the time of an administrative proceeding waives the right to raise such issues in federal court. *Harris v. Comm'r of Soc. Sec.,* No. 1: 11-cv-1290, 2012 WL 4434078 at *3 (N.D. Ohio Sept.24, 2012; *West v. Comm'r of Soc. Sec.*, No. 2: 11-cv-448, 2012 WL 3151209 at *6 (S.D. Ohio Aug. 2, 2012); *Hammond v. Chater*, 116 F.3d 1480 (6th Cir. 1997) (finding the plaintiff's failure to raise objections to the VE's testimony waived the argument on appeal); *Dantzer v. Comm'r of Soc.*

*Sec.*, No. 3:09-cv-2198, 2011 WL 1113458, at *13 (N.D. Ohio Jan 4, 2011) ("Failure to challenge the basis of the VE's testimony at the administrative hearing constitutes a waiver of the issue in the district court.").

Here, Tate's attorney, when presented with the opportunity to cross examine the VE asked two questions. The first offered a hypothetical that provided greater manipulative restrictions than the RFC ultimately adopted by the ALJ, and the second raised a hypothetical addressing an individual with limitations of his or her ability to regulate their emotions in the workplace. (Tr. 67). Each of these hypotheticals was found to be work preclusive by the VE. (*Id.*).

Tate contends in his reply brief that these hypotheticals posed at the hearing comprised a sufficient challenge to the alleged unresolved conflict in the VE's testimony to overcome waiver. (ECF Doc. 11, p. 2). I disagree. Both hypotheticals were posed without any contextual reference to a disagreement with the VE's assessment of how the DOT defined Tate's past relevant work. Rather, each was presented in a single sentence and was clearly intended to challenge the ALJ's assessment of the medical evidence, as opposed to the VE's interpretation of the DOT. This line of questioning did not sufficiently address the unresolved conflict Tate seeks to advance to overcome waiver, and, accordingly, is unavailable for this Court's consideration. It should further be noted that the ALJ inquired of the VE whether her testimony had been "consistent with the DOT and or the SCO," to which the VE responded that there were parts of the questioning that "would not be found in the DOT . . . those answers came from my professional experience and my education." (Tr. 67-68). This assertion was not challenged by Tate's counsel, and reflects that the VE's testimony served to supplement, rather than conflict with DOT. I therefore recommend that the decision of the ALJ be affirmed.

Even if the argument had not been waived, the conflict Tate suggests exists would not have merited remand. Tate cited repeatedly to O*NET in support of his contention that the VE's opinion was contradicted by descriptions of the bagger and order picker positions. (ECF Doc. 8, p. 8-9). The contradictory descriptions of these occupations in O*NET, however, are not consistent with the descriptions provided in the DOT. (DOT 922.687-058; 920.687-014).

SSR 00-4p reads, in pertinent part:

Occupational evidence provided by a VE [vocational expert] or VS [vocational source] generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

The onus placed on the ALJ by the regulations is to determine whether the evidence offered by the VE is consistent with the DOT, with no obligation to consider any other vocational resource.

In *Cunningham v. Astrue,* 360 F. App'x 606, 615 (6th Cir. 2010), the Sixth Circuit wrote that "[w]hile the Social Security Commissioner does take administrative notice of [the DOT] when determining if jobs exist in the national economy, 20 C.F.R. § 404.1566(d)(1), common sense dictates that when such descriptions appear obsolete a more recent source of information be consulted." That court further wrote that "more current job descriptions were available at the time of the hearing before the ALJ – the Department of Labor replaced the DOT with the Occupational Information Network (O*NET), a database that is continually based on data collection efforts that began in 2001." *Id.* at 616.

In the years that followed, several lower courts followed *Cunningham* and remanded matters to the ALJ based on VE reliance on potentially obsolete job descriptions from the DOT. *See, e.g., Wright v. Berryhill*, No. 4:18-CV-00021, 2019 WL 498855, at *9 (W.D. Ky. Feb. 8,

19

2019); *Westmoreland v. Berryhill*, No. 3:17-cv-00096, 2018 WL 1522118, at *4 (S.D. Ohio Mar.

28, 2018); *Rollston v. Comm'r of Soc. Sec.*, No. 1:16-CV-168, 2016 WL 6436676, at *4 (W.D.

Mich. Nov. 1, 2016). Others, however, declined to follow *Cunningham* and criticized its

reasoning. *See, e.g.*, *Kidd v. Berryhill*, No. 5:17-CV-420-REW, 2018 WL 3040894, at *7-10

(E.D. Ky. June 19, 2018); *Montano v. Comm'r of Soc. Sec.*, No. 1:13-cv-70, 2014 WL 585363, at

*15 (S.D. Ohio Feb. 14, 2014); *Belew v. Astrue*, No. 2:11-107-DCR, 2012 WL 3027114, at *9-

10 (E.D. Ky. July 24, 2012); *see also Webb v. Comm'r of Soc. Sec.*, No. 16-11786, 2017 WL

2312827, at *10 (E.D. Mich. Apr. 25, 2017).

The 6th Circuit provided clarification of this issue in *O'Neal v. Comm'r of Soc. Sec.*, 799

F. App'x 313, 317, writing:

> Although the court remanded to the ALJ in *Cunningham* for further consideration
> at step five, the panel did not conclude categorically that the DOT was an obsolete
> and unreliable source of job information. The current regulation governing this
> inquiry lists the DOT as a source of "reliable job information." 20 C.F.R.
> § 404.1566(d)(1). The regulation does not list O*NET as a reliable source. And,
> in fact, in 2010, the SSA determined that O*NET in its current form was not
> suitable for disability claims adjudication. *See* Occupational Infor. Dev. Advisory
> Panel, *Findings Report: A Review of the National Academy of Sciences Report*,
> Report to the Comm'r of Soc. Sec. 1, 8 (June 28, 2010), https://www.ssa.gov/
> oidap/Documents/COMPLETE%20FINAL-Findings%20Report%20OIDAP% 20062810.pdf.

In a footnote, the Court noted that, although the United States Department of Labor replaced the

DOT with O*NET, the Social Security Administration declines to use O*NET in disability

proceedings. *Id.* Thus, "all that is required before an ALJ can rely on vocational evidence

provided by a vocational expert is that the ALJ either ensure that the evidence does not conflict

with the information in the DOT or obtain a reasonable explanation for any conflict." *Stella M. v.

O'Malley,* No. 4:24-cv-00001, 2024 WL 3907289, at *10 (W.D. Kentucky Aug. 21, 2024), citing

*O'Neal*, 799 F. App'x at 317.

Here, the ALJ satisfied that requirement by inquiring of the VE whether her testimony had been consistent with the DOT and or the SCO (Tr. 67), eliciting the VE's response that her testimony had been consistent with the DOT, while noting that where the DOT did not speak to particular points, she had relied on her professional experience and education. (Tr. 67-68). As noted above, this indicates that her testimony supplements, rather than conflicts, with the DOT. Accordingly, even if waiver did not obviate the need to consider his argument, Tate has not demonstrated a conflict between the VE testimony and the DOT, and I therefore cannot recommend remand.

## VII.      Recommendation

Because the Administrative Law Judge applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Tate's application for Disability Insurance Benefits be affirmed.


Dated: December 30, 2024

Reuben J. Sheperd
United States Magistrate Judge

_____


**OBJECTIONS**


**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of

the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

***

Failure to file objection within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019).